Battle, J.
 

 The original hill was filed at the Fall Term, 1846, of the Court of Equity for Anson county, by Benjamin. Barnawell and his wife, against Patrick B. Threadgill, (executor of Thomas Threadgill,) Gideon B. Threadgill, Thomas EL Threadgill, Wilson Allen, George Allen and Joseph W. Allen, in which was stated, substantially, the following case-: Col. Thomas Threadgill died some time in the year 1836, leaving a will, which, after a caveat, was duly proved in 1841, and the defendant Patrick B. Threadgill, the executor therein named, was duly qualified, and took upon himself the burden of its execution. The plaintiffs, Benjamin Barnawell and his wife, commenced a suit in October, 1841, upon a bond given by the testator to the feme-plaintiff, who was his daughter, the trial of which was delayed until the Fall Term, 1845, of the Superior Court of law of Anson county, when they recovered a judgment for a large sum, to wit, $4950,83
 
 *52
 
 and costs, tlie executor having admitted assets, and having, in truth, more than sufficient, in slaves and other property, to pay the said j udgmeut.
 
 It
 
 was alleged that the defendants liad previously, with the view of defeating the plaintiffs’ expected recovery, combined together, and by fraud, procured an or-dor from the County Court of Anson, at the instance of the executor, for a sale of some of the negroes belonging to the estate of his testator, under the pretence that the same'was necessary for the payment of debts, and for distribution, and that the defendants, having great influence over the executor, who was a very intemperate man, by means of a sale, or pretended sale, got into tlieir hands several of the slaves, and other assets, belonging to the estate of the testator. It was further alleged that, in expectation that the plaintiff's would obtain judgment in their suit at a special term of the Superior Court, which was appointed to be held for the county of Anson in May, 1845, the defendants, about that time, secretly carried off eighteen slaves belonging to the estate of the testator, to wit, Keziah, Tony, Beck, Charles, Smiley and child, Judy, Jinny, Eranlcy and two children, Dinah, Edmund, Will, Laura, Rosanna, Mima and Polly, and sold them, or otherwise disposed of them, in the State of South Carolina. The prayer was that the defendants should, by an order of the Court, be compelled to bring back the said slaves, or to pay the judgment aforesaid, with costs.
 

 The defendants severally filed their answers, in which they denied, each for himself, any combination or fraudulent purpose, to defeat the plaintiffs’ j udgment. They admitted that, at the death of the testator, Thomas Threadgill, the assets belonging to his estate, were amply sufficient for the payment of all his debts, (that of the plaintiffs included,) but that the assets were wasted by the executor, so that when the plaintiffs obtained their ‘judgment, there was nothing wherewith to satisfy it. The defendant Gideon B. Threadgill stated, that at the sale, made by the executor in 1842, he bought and paid for three _ slaves, Keziah, Tony and Laura; that they were sold, at public auction, where many persons, able to
 
 *53
 
 buy, were present, and that be purchased fairly, and for a full price, and further, that he did not then know of the debt for which the plaintiffs obtained their judgment. lie stated further, that he purchased Jinny, from the executor, at a private sale, but that she was afterwards, levied on by Joseph "White, the then sheriff of Anson county, and sold, when he became the purchaser at $450, which he paid to the said sheriff. That these were all the slaves he bought of the executor, and he sent them all to South Carolina, but not in the manner, nor for the purpose charged in the bill. He also sent with them the slaves Smiley and her three children, which had been levied upon by George D. Boggan, who had become sheriff of Anson, and that he sold these slaves for the sheriff, for a fair price, and paid him the money. He stated further, that another slave, named Charles, was carried to South Carolina and sold by Thomas H. Threadgill for Patrick B. Threadgill, and that the price of $500 was paid by the said Thomas, to Young IT. Allen and Hull Threadgill, to whom the slave had been conveyed by the said Patrick, as an indemnity for their suretyship for him. This defendant stated further, that the defendant Wilson Allen was his agent in carrying off the slaves aforesaid ; and he denied that he had anjr agency or connection with the other defendants in carrying off their slaves, or that he had any intention to defraud the plaintiffs, or any other persons, by sending off his own.
 

 The defendant Thomas IT. Threadgill stated, that the testator, who was his grand-father, had, in his life-time, given him a negro named Will, and to his father, Hull Threadgill, two negroes, named Edmund and Franky, and by his will had confirmed the gifts ; that his father had had possession of the said slaves many years, and at the testator’s death, the executor had assented to the bequests; that he, the defendant, had, at the time stated in the bill, carried off the slaves Will and Edmund, and sold the former for $562,50 ; that while he was in South Carolina, his brother, Joseph Threadgill, brought out two slaves, Franky and her child Harriet, belonging to his father. He insisted that he and his father had held the
 
 *54
 
 slaves aforesaid, adversely, for more than tliree years before the bill was filed, and he claimed the benefit of the statute of limitations. lie denied that lie had carried the slaves off to defeat the plaintiffs’ recovery, but “ to prevent being liarrass-ed in the quiet possession of property,” to which he was advised he had a good right.
 

 The defendant George Allen stated, that he was present when the slaves, mentioned in the answers of the oilier defendants, were carried off; that about ton days before that time, he had sent off into South Carolina, a little girl named Uinali, the child of the woman Franky, and sold her for $300; that the said girl had been put into his possession by Hull Threadgill, whoso daughter he had married. He denied all combination and connection with the other defendants, and claimed the benefit of the statute of limitations.
 

 The defendant Wilson Allen, in his answer, denied any other connection with the transaction, than as the agent of the defendant Gideon B. Threadgill, to carry off his slaves, for which he was paid $50 ; that he sold the slave Judy for $430,25, and paid the money to Young II. Allen, who had a deed of trust for her.
 

 Joseph W. Allen, the remaining defendant, denied that he had any connection whatever with the transaction; that he had no interest in any of the slaves carried off; and that he, being near the place from which they were about to start, went, as a mere spectator, to see them, and did see them carried off.
 

 Those answers were filed at the Fall Term, 1846, when they were replied to by plaintiffs, and the parties proceeded to take their proofs.
 

 Subsequently, George Allen died, and Wilson Allen, his administrator, was made a party, and filed an answer as such, at the Fall Term, 1847.
 

 At the Spring Term, 1853, the plaintiffs filed a supplemental bill, in which they sot forth as supplemental matter, that, after the filing of their original bill, they removed to the State of Tennessee, leaving their son, Benjamin F. Barnawell,
 
 *55
 
 witli a power of attorney, authorising him to prosecute their suit; that he was a young man, not much versed in business; that the defendants, who were nearly all his relations, took advantage of his youth and inexperience, and, after having prevailed upon him to procure from his father and mother, the plaintiffs, a sufficient power of attorney for that purpose, artfully and fraudulently procured from him the following instrument, purporting to be a compromise of their suit:
 

 “State of North Carolina, Anson County :
 

 Articles of agreement, entered into this 12th day of July, ■1852, between Benjamin Barnawell, of the State of Tennessee, of the one part, and G. B. Threadgill, T. IT. Threadgill, Wilson Allen, and Wilson Allen, administrator of George Allen, all of the County of Anson, and State of North Carolina, of the other part, witnesseth: that whereas there is a suit pending in the Court of Equity, for the County of Anson, whérein Benjamin Barnawell and wife, Rebecca, are plaintiffs, and Gideon B. Threadgill, Wilson Allen and others, are defendants^ in which a claim is set up by the plaintiffs against the defendants, for certain negro slaves, named in the plaintiffs’ said bill, which are alleged to have been carried off to parts unknown by the said defendants; and whereas, the parties to the said suit, that is to say, the said Benjamin Barnawell, and the said Gideon B. Threadgill, T. IT. Threadgill, Wilson Allen, and Wilson Allen, as the administrator of George Allen, have agreed to settle and compromise the said suit in Equity, and all the claim and right of the said Barnawell and wife as preferred in the said suit: Now, therefore, in consideration that the said Barnawell and wife will dismiss their said bill in Equity at their own costs, and release their cause of suit, the said defendants covenant and agree to pay to the said Benjamin Barnawell, or order, two hundred dollars in cash; and, in consideration thereof, the said Benjamin Barnawell, on his part, covenants and. agrees, to, and with, the said Gideon B. Threadgill, Thomas IT. Threadgill, Wilson Allen, and the said Wilson Allen, as administrator of George Allen, deck!., that the 6aid suit in Equity shall be dismissed at his costs, at the
 
 *56
 
 next September Term of the Superior Court for Anson County; and he hereby appoints James L. Gaines his attorney to dismiss said suit at that time ; and the said Benjamin Barnawell, in consideration of the premises, has released, and forever quit claim, and by these presents doth release and forever quit claim, unto the said Gideon B. Threadgill, Thomas H. Thread-gill, Wilson Allen, and Wilson Allen, as administrator of George Allen, dec’d., all actions, demands, or cause of action at Law or in Equity, and all right to damages and claims of whatever nature, arising from, or growing out of, any matter or thing complained of, alleged or charged, in the aforesaid bill in Equity, brought by himself and wife against the said defendants and others. In testimony whereof they have hereunto severally set their hands and seals, the day and date above written,
 

 Benjamin Babnawell*, [Seal.]
 

 by B. F. Babnawell, Attorney.
 

 G. B. Tiibeadgill, [Seal.]
 

 T. II. Threadgill, [Seal ]
 

 WilsoN Allen, [Seal.]
 

 WilsoN Allen, Adm’r., [Seal.]”
 

 The plaintiffs state particularly, and in detail, the circumstances of fraud and circumvention, under which they allege that this instrument was obtained from their son ; and, among other things, they say, that the defendants
 
 kept the
 
 whole transaction studiously concealed from the counsel of the plaintiffs, and from some of their friends, to whom they had assigned a part of the judgment at law. They state further, that the defendant, Wilson Allen, paid to their attorney $100 in cash; that the defendant, Thomas II. Threadgill did not pay any thing at the time, but, some days afterwards, gave his promissory note for the same sum, and that the defendant, Gideon B. Threadgill, paid nothing, but instead thereof, executed the instrument, of which the following is a copy:
 
 “
 
 Know all men by these presents, that I will pay to Benjamin E. Barnawell, as agent of Benjamin Barnawell, one hundred dollars, provided the said Benjamin E. Barnawell shall,
 
 *57
 
 between this date and September Term of the Superior Court of Law and Equity, in the County of Anson, procure from Benjamin Barnawell, and deliver the same to me, a release, under the hand and seal of the said Barnawell to me, of my land lying adjoining the lands of Dr. "Watkins, Simeon Pem-berton and others, purchased from Thomas LI. Threadgill, from all liability to execution at the suit of said Benjamin Barnawell and wife against Patrick B. Threadgill; or provided, before the said September Court, the said Benjamin F. Barnawell shall execute to me, in the name of Benjamin Bar-nawell,'a release to the import aforesaid, under a duly authenticated power of attorney from the said Benjamin Barnawell to him, the said Benjamin F. Barnawell, authorising him to execute the said release to the import aforesaid. In testimony whereof, I have hereunto set my hand and seal, this, the 12th day of duly, 1852. Signed,
 

 G. B. Threadgill, [Seal]”
 

 The prayer of the bill was, that the defendants should be enjoined from setting up the said instrument, and that the same should be surrendered up to be cancelled, and for general relief.
 

 The defendants all filed answers to the supplemental bill, and therein denied that the instrument of compromise and release wTas fraudulently or unfairly obtained, and insisted on being allowed the benefit of it.
 

 And they, in their turn, at February Term, 1855, filed a cross-bill against the plaintiffs in the original and supplemental bills, for the purpose of setting up the said instrument as a bar to the relief sought by the plaintiffs, and praying that their bill might be dismissed. To this cross-bill, the defendants thereto filed their answer, in which they denied the material allegations of the said bill, as to the manner in which the instrument of compromise and release had been obtained, and reasserted the statements of their supplemental bill in relation thereto. A replication was put in, and the parties proceeded to take proofs, which being completed, both causes were set for hearing and transmitted to the Supreme Court.
 

 
 *58
 
 These causes have been properly brought on to bo heard together. They relate to the same subject matter, and the decision of one will, necessarily, determine the other. The right to the relief which is asserted by the plaintiffs in their original bill, is alleged by the defendants therein to have been subsequently compromised and released by an instrument, which it is the object of the supplemental bill to have set aside, and which the cross-bill seeks to have established, so that the defendants may have the benefit of it.
 

 In this state of the litigation between the parties, it is manifestly the proper course that we should first consider whether the instrument which was executed on the 12th of July, 1852, by and between the plaintiffs, through their agent and attorney on the one side, and throe of the defendants on the other, can be supported as a fair compromise and release of the rights of the former. “'Where a compromise of a doubtful claim is entered into fairly, and with due deliberation, and upon consideration,” it will undoubtedly be supported in this Court. This is clearly shown by the authorities to which we have been referred by the defendants’ counsel:
 
 Leonard
 
 v. Leonard, 2 Ball, and Beat. Rep. 178;
 
 Attwood’s case,
 
 1 Russ. Rep. 353;
 
 Nailor
 
 v.
 
 Winch,
 
 1 Sim. and Stew. Rep. 564;
 
 Goodman
 
 v.
 
 Sears,
 
 2 Jac. and Walk. Rep. 262. The plaintiffs allege that the deed in question was procured from their agent by fraud and circumvention, and if this be so, it is equally clear that the Court will relieve against it.
 

 The question then is, was it fairly obtained?
 

 The counsel for the defendants insist that, in the examination of this question, the instrument is to be taken as a deed of compromise instead of one of release. He contends that there is a difference in the principle applicable to it, when viewed in the light of a compromise, from that which would be applied to a release, and for this position he relies upon what is said by Lord ChaNoelloe MaNNeks in the above cited case of
 
 Leonard
 
 v. Leonard: “ This deed has been treated as a release. Now, that is not the precise description of the instrument. Between a mere release and a deed of com
 
 *59
 
 promise of this nature, there is this distinction — that in the former the parties know their respective rights, and the one surrenders his rights to the other; in the latter, both parties are ignorant of their rights, and the agreement is founded on that ignorance, and the party surrendering may, in truth, have nothing to surrender; and whether the uncertainty rests upon a doubt in point of fact, or a doubt in point of law, if both parlies are in the same ignorance, the fairness of the compromise cannot be affected by a subsequent investigation and result.”. The instrument, in the present case, purports to be both a compromise and a release, but as the release is founded upon the compromise, and was intended to be a part execution of it, we think the instrument ought to be treated as a deed of compromise, and we shall so consider it in our examination of it, and of the circumstances under which it was obtained.
 

 To show that the instrument was procured by fraudulent means, the deposition of one witness only" has been taken by the plaintiffs. That witness is their son and agent, and his testimony is far from being sufficient, of itself, to prove the allegation of fraud. ITe admits that the deed was read over to him, and he knew the bill was to be dismissed, and that the plaintiffs’ judgment was for a “big debt,” but of what amount he was ignorant. He says that "Wilson Allen paid him $100 ; that Thomas IT. Threadgill gave his note for that, amount, which- he assigned to another person, and he understood that it had since been paid; and that Gideon B. Thread-gill gave him a bond, with conditions, which had never been paid. lie states further, that he did not understand “ the effect of the compromise” until he was afterwards informed of it by his father’s counsel,
 
 George C.
 
 Mendenhall, and that Gideon B. Threadgill charged him to keep it a secret from his father’s friends, Dr. Watkins and William Allen, though he thinks he, also, proposed that the transaction should be kept a secret. In this last particular his testimony agrees with the answers of the defendants who were concerned in the transaction, but they deny positively that they enjoined se
 
 *60
 
 crecy upon the agent. Upon this part of the case the defendants have not taken any proofs, but rely altogether upon the allegations of fairness contained in their answers. As these are responsive to the charges of the bill, we should feel ourselves bound to hold those charges to be unsustained by the proof, were it not for the conclusive evidence of fraudulent practices furnished by the instrument itself, considered in connection with the other written testimony, about which there can be no mistake. The plaintiffs’ judgment against the executor of Col. Thomas Threadgill, was obtained at Fall Term, 1845, of Anson Superior Court, for $4950,83, of which sum $2500 was principal, and bore interest from that time; and'upon this judgment, it appeal’s, that only $333,46 had been paid, so that, at the time of the compromise, the debt and interest amounted to about $5600. The instrument prepared by the counsel for the defendants at their instance, provides (according to the copy which is filed as an exhibit) for the payment, by the defendants, of $200 only, when all the answers admit that $300 was to be paid. Of this sum, only one hundred dollars were paid at the time, and a negotiable note given for a like sum by Thomas II. Threadgill, while the defendant Gideon B. Threadgill gave a bond for what he was to paju on the condition for the performance, by the agent, of something, which shows clearly that he had strong misgivings that all was not right. Here, then, we have an agent agreeing to give up ah undoubted claim of his principal for $5600, in consideration of two, or, at most, three hundred dollars to be paid him. We are aware that the authorities establish the principle that mere inadequacy of consideration will not defeat the compromise of a doubtful claim; where it is entered into fairly and with due deliberation.
 
 Nailor
 
 v.
 
 Winch, Leonard
 
 v. Leonard,
 
 ubi supra,
 
 and the other cases. Here, the only doubtful matter was the liability of the defendants for the slaves which they had carried off; and if liable, the extent of that liability. About that, the agent must have been profoundly ignorant; and as the transaction, while in progress, was kept secret from his father’s counsel and friends, he had
 
 *61
 
 no means of getting information, except from tlie defendants themselves. They do not pretend that they gave him any ; and whether the secrecy was proposed by them, or him, the result was the same. If he proposed it, they acquiesced in it, and they thus had every advantage in settling the terms. Of this, the vast inadequacy of the consideration must furnish strong testimony, and raises in the mind a suspicion of a collusion between the agent and the defendants to defraud the plaintiffs, or, perhaps, those persons to whom they had assigned a portion of their judgment. "We do not, however, rest the ease on tiffs ground, because it is not assumed in the bill. The basis of our opinion is that the defendants, with all the knowledge on their part of the only doubtful matters in dispute, entered into an arrangement with the agent, by which his principal was to got not more than one-twentieth part of his debt, it bein'g a part of the arrangement, at the same time, that it was to be kept a profound secret from the principal’s counsel and friends. In this view of the case we think that we are strongly sustained by what was said by the Lord CiiaNcelloR in the case of
 
 Leonard
 
 v. Leonard, upon the suppression or misrepresentation of a fact by one of the parties :
 
 “
 
 Here there is a material fact suppressed or misrepresented by the defendants’ agent, and by which the plaintiff', acting under a mistake, ought not to be prejudiced. The deed itself, though it does not represent these lands as being held in joint-tenancy, suppresses the fact of their being held by these brothers as tenants in common ; and when it is made manifest that the compromise was entered into between parties under a misapprehension of fact, known to the one party, or his agent, and unknown, or misrepresented to the other, the compromise is deficient in that which is essential to its ’validity — that both parties were in equal ignorance. And then the value of the plaintiff’s rights may fairly be relied upon, which, otherwise, I do not think could avail, unless it furnished, of itself, proof that the other party had been imposed upon and defrauded.”
 

 This extract show’s clearly that inadequacy of consideration
 
 *62
 
 may have some weight, when there are other circumstances of suspicion about the compromise ; and it shows further, that the parties must deal with each other upon an equal footing, which was certainly not so in our case, where the defendants, as they themselves state, consulted with their counsel, but (to say the least) connived with the plaintiffs’ agent in keeping the matter secret from their counsel.
 

 Our opinion then, is, that the cross-bill must be dismissed with costs, and that the plaintiffs are entitled to have the instrument of compromise surrendered up to be cancelled, according to the prayer of the supplemental bill.
 

 The alleged compromise being removed out of their way, the plaintiffs are entitled to the relief which is sought in their original and supplemental bills as against the defendants, or some of them. When this cause was brought before the Court, at a former term, upon a demurrer, (see 5 Ire. Eq. Rep. 80,) it was stated, as a clear principle of equity,
 
 “
 
 that a creditor may follow the assets into the hands of the legatees and other persons claiming as volunteers, or fraudulent alien-ees of an unfaithful and insolvent executor.” The only difficulty is in ascertaining which of the defendants is liable, and whether they are liable for the acts of each other. The defendant Patrick B. Threadgill, the executor, has died, insolvent, since the cause has been removed to this Court, and Ave arc not informed that there has been, or will be, any administration on his estate.
 

 Joseph
 
 W.
 
 Allen, another defendant, denies that he has ever had any of the assets in his hands, or that he was concerned in any way with the removal of the slaves from this State, and there is no sufficient evidence to disprove the positive assertions of his answer. He admits that he was present as a spectator when the negroes were started, and the testimony shows that he went with them a mile or two. This is not sufficient to charge him, and its only effect will be to deprive him of the costs to which he would otherwise have been entitled upon having the bill dismissed as to him.
 

 The plaintiffs charge a combination among the defendant*
 
 *63
 
 to deprive them of the fruits of their judgment, by carrying off all the slaves which would have been assets for its payment. Their counsel insist, therefore, that they are justly liable for the acts of all and each. The testimony has failed to convince us that there was any thing like a conspiracy, by which each was to assist the others in running the slaves out of the way, so as thereby to defeat the claim of the plaintiffs. Such may have been the fact; and though the evidence raises a suspicion of it, we cannot say that it has proved more than that each party, who had any of the slaves, which he had acquired under the will, or from the executor of Tlios. Thread-gill, deceased, resolved, and acted upon the resolution, to carry off such slaves, so that they should not be taken for the payment of the plaintiffs’ debt. That much is almost avowed in their answers, and is very clearly established by the proofs. Several witnesses testify that they heard the defendants Patrick, Thomas, and Gideon, say, at different times, that the debt was unjust, and they would never pay it.
 

 The defendant Wilson Allen denies that he had, and is not proved to have had, any connection with the transaction, except to carry off the slaves for the defendant Gideon B. Threadgill, as his agent. It seems that he sold a slave named Judy, and paid the price to Young II. Allen, who had a prior lien upon her. Under these circumstances, his counsel contends that no decree can be had against him, and in support of his argument, cited and relied upon the cases of
 
 Bukly v. Dunlar,
 
 1 Anstr. Rep. 37, and
 
 Newman
 
 v. Godfrey, 2 Bro. Ch. cas. 333; also Danl’s. Ch. Pr. 344; Stor. Eq. PI. sec. 252, 254, 838, and Mitf. Eq. PI. 160. In bills, like the present, the Court does not proceed upon the idea of punishing the defendant for a tort, but upon that of following the assets in his hands, and making him responsible therefor, unless he be a purchaser upon an honest contract. As it is not shown that this defendant acted from any fraudulent purpose to hinder or delay the plaintiffs in the recovery of their debt, or that he had, at the time when the bill was filed, or has now, any of the slaves, or other assets of the estate of Thomas Thread-
 
 *64
 
 gill, in bis bands, no decree, except for costs, can bo had against him. From bis conduct, the plaintiffs had apparent cause for making him a party, and the authorities upon which his counsel relies, show that he is liable for costs.
 

 George Allen was a defendant in the original bill, and answered it, admitting that he carried off, and sold, a little girl named Dinah, at the price of $300. He stated that this girl was the child of a negro woman, named Franlty, whom the testator had given to Hull Threadgill, and confirmed the gift by his will, and that the said Hull had put the girl into his possession upon his marriage with his daughter. lie denied any concert with the other defendants, and insisted on the benefit of the statute of limitations. Our opinion is that the statute cannot aid him. The debt upon which the plaintiffs’ judgment was obtained, did not become due until the year 1840, and the issue of
 
 devisavit vel non
 
 was not decided until 1840. They commenced suit upon it in October, 1841, and recovered judgment in the Fall of 1845, and filed their bill at the Spring Term following. Under these circumstances, they, as creditors, were not barred by the adverse claim of the defendant and his father-in-law, under whom he claimed. Nor is he protected by the fact, that the executor had assets sufficient to pay all the debts of the estate, if he had not wasted them. The plaintiffs used all the diligence in their power in the prosecution of their claim, and they are entitled to have satisfaction out of the assets in the
 
 “
 
 hands of the legatees and other persons claiming as volunteers.” They are entitled, therefore, to a decree against Wilson Allen, as administrator of George Allen, for the price of the girl Dinah, with interest thereon, and there may be an account taken, if the parties desire it, whether the said administrator has assets enough to pay it.
 

 The reasons assigned for the liability of the defendant George Allen, will apply with equal force to the defendant Thomas IT. Threadgill, so as to make him liable for the sum (to wit, $562,50) for which he sold the slave Will, and for interest on that sum. It does not appear from his answer, or
 
 *65
 
 the proof's, that he has in his hands any other assets of the estate, unless his taking the slave Edmund into South Carolina and hiring him out there for his father, amounts, in the view of this Court, to his having him in possession. The only testimony in relation to this slave is derived.from the defendant’s answer. Tie says, that his. brother Joseph was carrying the slave into South Carolina, when, overtaking him, he sent him back, and carried the slave on himself, and hired him out in that country, “ his father being in- a paralytical condition, and unable to attend to-his business.” We think that, under these circumstances, he must be held responsible for the slave or his value, and his hires; as to which there must be an account, if the parties desire it.
 

 The extent of the liability of the defendant Gideon B. Thread-gill alone remains to b.e considered. He alleges, that at the sale made by the executor in 1842, he bought, at a fair price, and paid for the slaves Keziah, Tony and Laura, but he has not furnished us with any proof of such payment. Standing in the relation which he did to the executor, who was very intemperate and insolvent, or fast becoming so, it was incumbent upon him to prove that the sale was fair, and that he purchased fairly and paid the price.
 
 Satterwhite
 
 v.
 
 Hicks,
 
 Bus. Rep. 105. In the absence of such proof we must hold him responsible for the value of these slaves. ITe cannot be held liable for Jenny, nor for Smiley and her children, because the testimony shows that he purchased the first of sheriff White, and paid him for her, and he sold the others for sheriff Bog-gan, and paid him the proceeds. Nor can he be made liable for the price of Charles, who was sold by Thomas H. Thread-gill, and the price (to wit, $500) paid to Young H. Allen and Hull Threadgill, who, it was proved, had a prior lien upon him.
 

 The plaintiffs then may have a decree against this defendant for the value of the slaves Keziah, Tony, and Laura; to ascertain which, there most be a reference. This defendant will not be allowed the $100 for which he gave his bond to the plaintiffs’ agent, as it appears it has never been paid. His
 
 *66
 
 counsel said, on argument, that it bad, or, at least, that the plaintiffs bad a judgment for it. In this he was mistaken, as, upon a closer inspection of the exhibit, it appears that the judgment was set aside and a new trial granted, and that, af-terwards, the plaintiff was non-suited. The other defendant, "Wilson Allen, as administrator of George Allen, and Thomas H. Threadgill, will be allowed the sums which they paid the agent.
 

 Pee CuRiAM. Decree accordingly.